# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,                                   Case No.   11-CR-110 JNE/SER

      Plaintiff,

v.                                                          **REPORT AND RECOMMENDATION**

Orlando Ray Vasquez (01), and
Gregory Scott Tyler (02),

      Defendants.

---

Collin Johnson, Esq., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff.

Thomas G. Dunnwald, Esq., Dunnwald & Peterson, P.A., 412 Fourth South Street, Suite 1150E, Minneapolis, Minnesota 55415, for Defendant Vasquez.

George R. Dunn, Esq., Tilton & Dunn, P.L.L.P., 101 East Fifth Street, Suite 2220, Saint Paul, Minnesota 55101, for Defendant Tyler.

---

STEVEN E. RAU, United States Magistrate Judge

The above captioned case comes before the undersigned United States Magistrate Judge on Defendant Vasquez's Motion to Suppress Statements Made by Defendant [Doc. No. 34]; Defendant Tyler's Pretrial Motion to Suppress Statements, Admissions, and Answers [Doc. No. 30]; Defendant Vasquez's Motion to Suppress Search and Seizure [Doc. No. 35]; Defendant Tyler's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 29]; Defendant Vasquez's *Pro Se* Motion for Relief from the Judgment Protection of Due Process Rights [Doc. No. 72]; Defendant Vasquez's Motion to Suppress Eyewitness Identification [Doc. No. 36]; and Defendant Tyler's Motion to Suppress Eyewitness

Identifications [Doc. No. 28].[1]  This matter has been referred for the resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and District of Minnesota Local Rule 72.1.  The Court recommends that Defendants' motions be denied.

## I.  BACKGROUND

On March 1, 2011, Defendant Gregory Scott Tyler (02) ("Tyler") was charged with felony Bank Robbery in violation of 18 U.S.C. § 2113(a) and Escape in violation of 18 U.S.C. § 751(a) [Doc. No. 1].  Defendant Orlando Ray Vasquez (02) ("Vasquez") was charged with Bank Robbery in violation of 18 U.S.C. § 2113(a) on March 2, 2011 [Doc. No. 1] and on May 17, 2011 with Escape in violation of 18 U.S.C. § 751(a) [Doc. No. 41].  The Court held a pre-trial motions hearing on July 21, 2011 [Doc. No. 78].  F.B.I Agent Matthew Parker ("Agent Parker"), Deputy U.S. Marshal Paul Keyes ("Deputy Keyes"), Deputy U.S. Marshal John Murphy ("Deputy Murphy"), and Saint Paul Police Officer Jeffrey Gillsrude ("Officer Gillsrude") testified on behalf of the Government.  The Court received four exhibits into evidence: Gov't Ex. A, *Miranda* Rights Card (Vasquez); Gov't Ex. B, F.B.I. Consent to Search Form (Vasquez); and Gov't Ex. C, U.S.D.A. Advice and Waiver of Rights Form (Tyler); and Gov't Ex. D, F.B.I. Consent to Search Form (Tyler).

At Defendants' request, the Court gave Defendants until August 22, 2011 to file their post-hearing briefs and allowed the Government until September 1, 2011 to file its post-hearing briefs [Doc. No. 78].  The Court took the matter under advisement as of September 1, 2011 upon receipt of the Government's briefs.  This matter is set for trial before United States District Judge Joan N. Ericksen.

## II.  FACTS

The following facts were elicited from the testimony and exhibits introduced at the hearing.[2]

---

[1] The non-dispositive pretrial motions are addressed in a separate Order.

The Court will include only the facts that are relevant to Defendants' pretrial suppression motions.

### A.   February 26, 2011

At 8:30 a.m. on February 26, 2011, Deputy Keyes received a telephone call from staff at the Volunteers of America halfway house on Lake Street in Minneapolis ("VOA") informing the U.S. Marshals that Tyler absconded.   At approximately 6:05 a.m., Tyler walked away from the VOA and tampered with his GPS monitoring bracelet.  (Tr. 69).   Deputy Keyes immediately began to gather information on Tyler such as his photo and family background to assist in his investigation of Tyler's escape.   (Tr. 70).   VOA staff informed Deputy Keyes that Tyler's roommate, Daniel Greipe ("Greipe"), filed a police report with the Minneapolis Police Department alleging that his 1986 purple Acura ("purple Acura"), driver's license, and credit cards were stolen.  (Tr. 71).

The VOA staff told Keyes that the Bureau of Prisons was issuing an escape warrant for Tyler.   (Tr. 84).   At Deputy Keyes' request, the Minneapolis Police Department issued a probable cause arrest warrant for Tyler.  (Tr. 78).   Later in the morning, Deputy Keyes visited Tyler's mother and sisters' home to obtain additional information and attempt to ascertain Tyler's whereabouts.  (Tr. 85).  Tyler's sister said she had not seen Tyler.  (Tr. 85).

### B.   February 28, 2011

The TCF Bank on at 1444 West Lake Street Lake Street in Minneapolis was robbed at 7:45 a.m.  (Tr. 12).  At approximately 8:30 a.m. on February 28, 2011, Deputy Keyes received a phone call from Sargent Sandberg of the Minneapolis Police Department informing him that the

---

[2] The page references cited herein are found in the Transcript of the Motions Hearing, *United States v. Orlando Ray Vasquez (01), Gregory Scott Tyler (02)*, (11CR110), July 21, 2011 [Doc. No. 94] ("Tr.").

purple Acura Greipe reported stolen was used as the alleged bank robbery getaway car.  (Tr. 8, 74).

Later that morning, Agent Parker and his partner, F.B.I. Agent Mark Fredcove ("Agent Fredcove"), arrived at the bank to investigate.  (Tr. 6).  Agent Parker testified that the security surveillance video showed a Hispanic man wearing a red baseball cap, dark jacket, and blue jeans extend his hand, point an object at the teller, and leave the bank.  (Tr. 6-7).  Another video surveillance tape showed two men coming into the Lunds grocery store at 7:44 a.m. and leaving the Lunds parking lot at approximately 8:30 a.m.  (Tr. 41).

At the intersection of 24th and Bryant, Agent Parker observed the badly damaged purple Acura.  (Tr. 8, 10, 74).  Officers responding to the scene recovered from the purple Acura a red baseball cap, resembling the cap that the bank robber wore, and stolen currency.  (Tr. 8-9).  Minneapolis Police also informed Agent Parker that just minutes after the crash, a woman was carjacked by a Hispanic man and a white man approximately one block away from the Acura crash site.  (Tr. 9).  Agents Parker and Fredcove, U.S. Marshals, and Minneapolis Police officers discussed via phone the connection between the theft of Greipe's car, the bank robbery, and Tyler's escape.  (Tr. 11-12).

Next, Deputies Keyes and Murphy interviewed Greipe.  (Tr. 108).  Greipe stated that he had no doubt that Tyler stole his car and took everything in his wallet including his driver's license and credit card.  (Tr. 72).  Greipe asserted that at the Workforce Center on Lake Street in Minneapolis sometime between 8:30 a.m. and 10:00 a.m. on February 24, 2011, Tyler introduced Greipe to a male friend.  (Tr. 73, 102).  Greipe described Tyler's friend as six feet tall, 200-pound Hispanic or Native American man.  (Tr. 73, 102).  In Deputy Keyes' presence, Greipe called his credit card company, Wells Fargo, and learned that someone attempted to use Greipe's

4

credit card at ATMs in Roseville and North Saint Paul on February 26, 2011.  (Tr. 86-87).
Keyes was unable to confirm or deny that Tyler tried to use Greipe's credit card at either
location.  (Tr. 88-89).

Next, Deputies Keyes and Murphy drove to the Workforce Center in Minneapolis to
review the surveillance video.  (Tr. 73).  The video showed an individual matching Tyler's
description seated with a Hispanic male at a table in the Workforce Center between 8:30 a.m.
and 10:00 a.m. on February 24, 2011.  (Tr. 73).  While at the Workforce Center, Deputy Keyes
received an email from Agent Fredcove containing three still photos of the stocky, dark-haired,
and square-jawed, male bank robber.  (Tr. 75-76, 110).  Deputy Keyes testified that the man in
the Workforce Center video "definitely [had] a very strong resemblance to the individual that
committed the bank robbery."  (Tr. 76).  These photos were forwarded via email to all Northstar
Task Force[3] members assisting in the investigation.  (Tr. 77).  Keyes also observed Tyler and the
Hispanic man in the Workforce Center video exchanging a jacket and hat that resembled the
clothing worn in the robbery.  (Tr. 76).  Fugitive Task force members, including United States
Department of Agriculture Office of the Inspector General Agent Tiffany Nelson ("Agent
Nelson"), were also monitoring Tyler's use of the EBT card.  (Tr. 77-79).

### C.  March 1, 2011

On the morning of March 1, 2011, Agent Nelson notified Deputy Keyes that between
7:30 a.m. and 8:00 a.m. that day, Tyler's EBT card was used at a BP gas station on West 7th
Street in St. Paul.  (Tr. 77-79, 90).  The U.S.D.A. accessed Tyler's EBT card information
because Tyler was on "fugitive status."  (Tr. 93).  Deputy Keyes then traveled to the gas station

---

[3] The North Star Fugitive Task Force ("Fugitive Task Force") includes the U.S. Marshals,
the Ramsey County Sheriff's Department, the Saint Paul, Duluth, and Rochester Police
Departments, the Minnesota Department of Corrections, the U.S.D.O.IG., Housing and Urban
Development, and Olmstead County  (Tr. 82, 104).

to review the security video, which showed a Hispanic man and a white woman using the gas station ATM between 7:30 a.m. and 8:00 a.m.  (Tr. 79, 94).

After watching the video, Deputy Keyes left for Minneapolis to obtain an escape warrant from Magistrate Judge Arthur J. Boylan.  (Tr. 80).  Deputies Murphy and Matthews began canvassing the motels and hotels in the area around the BP gas station on West 7th Street in Saint Paul in search of Tyler.  (Tr. 80, 96).  Deputy Keyes stated that driving from the BP gas station on West 7th Street in St. Paul to the Federal Courthouse in Minneapolis would take typically between 15 and 20 minutes.  (Tr. 98).

Deputy Murphy spoke with the front desk clerk at the Highway Motel located on West 7th Street close to the BP gas station. (Tr. 102, 111-12).  Murphy showed the clerk a photo of Tyler and the still photos of the bank robber; the clerk was unable to make a positive identification.  (Tr. 112).  The clerk told Murphy that a man named Greipe checked into room 15 and gave Murphy a key to the room.  (Tr. 111).  Deputy Murphy called Deputy Keyes to tell him that he believed Tyler checked into the Highway Motel using Greipe's identification.  (Tr. 112-14).  Deputy Murphy also alerted the Northstar Fugitive Task Force members of Tyler's potential whereabouts and described the motel location and layout.  (Tr. 112-14).

Next, Deputy Murphy proceeded to a restaurant neighboring the Highway Motel off West 7th Street.  (Tr. 113-14).  While staked out at the restaurant, Deputy Murphy spotted Tyler and Vasquez through the south restaurant window at approximately 12:30 p.m.  (Tr. 114-15).  Based on photos, surveillance videos, and distinctive physical features, Deputy Murphy concluded he was observing Tyler and Vasquez.  (Tr. 115-16).  Murphy observed Tyler nervously examining Murphy's black Blazer.  (Tr. 116).  Both Tyler and Vasquez were standing on the far side of the street, giving Deputy Murphy a clear view.  (Tr. 117).  Murphy immediately radioed and

6

requested assistance from the Fugitive Task Force.  (Tr. 104-05, 117-18).  Deputy Murphy intended to apprehend Tyler because he was an escaped BOP prisoner and because the Minneapolis Police Department issued a probable cause warrant for Tyler's arrest in conjunction with the alleged car and credit card theft.[4]  (Tr. 118).  Within 15 to 20 minutes, Northstar Fugitive Task Force members converged on the Highway Motel.  (Tr. 105, 125).

As several squad cars with sirens activated[5] approached the motel, Tyler started walking away from the street into an alley behind the restaurant towards the Pearson's Candy Company parking lot and Vasquez headed back toward the motel.  (Tr. 119-21, 128).  Murphy suspected that Tyler and Vasquez were attempting to flee.  (Tr. 121).

Law enforcement officers in marked and unmarked squad cars, including Officer Gillsrude and a canine unit, approached Tyler, who was walking eastbound on Rankin Street south of West 7th Street.  (Tr. 148, 160).  The officers ordered Tyler to the ground and Officer Gillsrude's partner, Officer Leonard, handcuffed Tyler and placed him in the back of a squad car. (Tr. 149).  Tyler complied without resistance.  (Tr. 156).  While Tyler was handcuffed, a U.S. Marshal asked Tyler how many people were in the hotel room and if there were any weapons in the motel room.  (Tr. 151).  Tyler said that there was one person in the motel room and no weapons were present.  (Tr. 151-52).  Tyler volunteered to assist law enforcement in getting Vasquez out of the motel room.  (Tr. 151-52, 161).  Officer Gillsrude testified that while in the squad car and without prompting from the officers, Tyler stated that he was "glad it was over" and that it was Vasquez's idea to "keep this going."  (Tr. 150, 152, 158).  Officers Gillsrude and Leonard drove Tyler up to the motel.  Later, Tyler stated that his shoulder was bothering him,

---

[4] At this point in the investigation, Deputy Murphy did not yet know Vasquez's name but knew that Tyler may have been travelling with a man matching Vasquez's description.  (Tr. 119).

[5] Deputy Murphy testified that from inside the restaurant, he could not hear the sirens. (Tr. 137).

and out of a concern for Tyler's comfort, Officer Gillsrude moved Tyler's handcuffs from back to front.  (Tr. 153).  Tyler waited in the car for several minutes outside the motel room.  (Tr. 153).

When the second group of officers arrived at the motel, they set-up a perimeter around the motel room with their weapons drawn and their badges visible.[6]  (Tr. 120, 129).  Vasquez opened the motel room curtains, put his hands in the air, and surrendered within 30 seconds of law enforcement's arrival.  (Tr. 121-22).  At that point, three officers in addition to Deputy Murphy were approximately 15 feet outside the motel room.  (Tr. 122, 129).  Vasquez pointed towards the ground without saying anything, presumably to inquire as to whether the officers wanted him to get on the ground.  (Tr. 122-23).  Deputy Wickenheiser said, "No, don't do that" to Vasquez.  (Tr. 123).  Vasquez then reached past the window towards the door.  (Tr. 123).  The officers were unsure whether Vasquez was attempting to reach for a weapon or come outside the hotel room to surrender; they instructed Vasquez to keep his hands in the air.  (Tr. 123).  Vasquez took two steps back and sat on the bed with his hands in the air in surrender.  (Tr. 123).

Using the key card the motel desk clerk gave him, Deputy Murphy opened the motel room door, ordered Vasquez to the ground, and, with his weapon drawn and aimed, placed Vasquez in handcuffs.  (Tr. 123).  Murphy decided to enter the motel room rather than order Vasquez out to ensure that he did not lose visual contact and that Vasquez was not hiding weapons.  (Tr. 142-44).  Without any prompting or communication from Murphy, Vasquez volunteered that he knew where Tyler was going and could help bring Tyler in.  (Tr. 123, 134, 141-42).  Murphy did not respond to this comment, but rather quickly looked around the room for weapons and asked Vasquez for his name, identification, and date of birth.  (Tr. 123-24, 134).

---

[6] Deputy Murphy testified that no other weapons aside from handguns were used in the apprehension of Vasquez but that the Marshals had access to rifles and automatic weapons.  (Tr. 129, 139).

Officers removed Vasquez from the motel room, conducted a cursory pat-frisk for weapons, and seated him on the ground outside motel room until the F.B.I. arrived. (Tr. 124-25, 135). Officers did not find any weapons on Vasquez. (Tr. 125). Vasquez was handcuffed and had visible injuries to his face and leg. (Tr. 28). Murphy ran Vasquez's information through the National Crime Information System ("N.C.I.C.") database in his car and determined that Vasquez was a fugitive wanted for escape in Nevada. (Tr. 124). Deputy Murphy did not speak to Vasquez other than to check on his welfare as they waited for the F.B.I. to arrive. (Tr. 135-36). Approximately 15 minutes later, several F.B.I. agents including Agent Parker arrived to interview Vasquez and Tyler. (Tr. 13-14, 30).

Between 1:00 p.m. and 1:30 p.m., Agents Parker and Fredcove, arrived at the Highway Motel. (Tr. 37). In the interest of expediency, Agent Parker interviewed Vasquez inside the door of the motel room at approximately 1:28 p.m. (Tr. 14, 30, 37). Before Agent Parker could read the *Miranda* Advice of Rights card ("Miranda card"), Vasquez stated that he did not want anyone to get hurt and that the situation was the bank teller's fault. (Gov't Ex. A); (Tr. 14). Agent Parker cut off Vasquez and read him a *Miranda* card.[7] (Gov't Ex. A); (Tr. 15). Vasquez made several additional statements before Agent Parker interrupted Vasquez to ask him whether he understood his *Miranda* rights and whether Vasquez still wanted to talk with him. (Tr. 15). Vasquez said "yes," acknowledging that he understood his *Miranda* rights and immediately began to speak about the case. (Tr. 15).

---

[7] At the hearing, Agent Parker explained that he ran out of the F.B.I. *Miranda* cards he typically used and instead read Vasquez a *Miranda* card photocopied onto a sheet of paper with which a U.S. Marshal on the scene provided him. (Gov't Ex. A); (Tr. 30-31, 33). A U.S.D.A. agent provided Agent Parker with the *Miranda* card Agent Parker used for Tyler's interview. (Gov't Ex. C); (Tr. 30). The Agent Parker testified that he did not know whether any other law enforcement officers read Vasquez his *Miranda* rights before Parker arrived. (Tr. 30).

Vasquez spoke English and did not ask to see a lawyer or say that he wanted to remain silent. (Tr. 15). Vasquez's injuries did not impair his ability to talk or understand Agent Parker. (Tr. 63). Vasquez did not sign the *Miranda* waiver form; Agents Parker and Fredcove wrote on the form that Vasquez "stated that he did agree to speak but preferred not to sign." (Gov't Ex. A); (Tr. 17). During the 20-minute interview, Vasquez also signed a Consent to Search form, which Agents Parker and Fredcove signed and witnessed. (Gov't Ex. B); (Tr. 17-19). In the interest of expediency and preserving evanescent evidence such as D.N.A., Agent Parker obtained a Consent to Search form from Vasquez rather than waiting for a warrant.[8] (Tr. 32, 57-58). Agent Parker testified that the jacket, wristband, and mace recovered from the motel room could be tested for D.N.A. evidence. (Tr. 56). Agent Parker did not remove the bloody sheets from the room because Vasquez was indisputably connected to the room and it was "obvious" that the blood came from Vasquez's cuts. (Tr. 58, 62). Vasquez was not injured on the day of the arrest but rather suffered the injuries in the car crash several days prior. (Tr. 62-63). Agent Parker testified that Vasquez had a disappointed affect and seemed to be in pain, though he did not appear nervous. (Tr. 28). After the interview, Vasquez was put into Officer Gillsrude's squad car. (Tr. 153).

Next, officers removed Tyler from the squad car, brought him into the motel room in handcuffs, and seated him in a chair. (Tr. 19, 37, 153). At his own initiation, Tyler stated that he was willing to speak with Agents Parker and Fredcove and requested that he be housed with Vasquez. (Tr. 19-20, 63-64). Agent Parker stated that he did not have any control over where inmates are housed and thought that the U.S. Marshal in charge could take care of such issues.

---

[8]Almost simultaneous with Tyler's arrest in Saint Paul, Magistrate Arthur J. Boylan signed the escape warrant for Tyler's arrest that Deputy Keyes presented him with at the Minneapolis Federal Courthouse [Doc. No. 14]. (Tr. 80).

(Tr. 20).   Agent Parker testified that his response to Tyler's statement was not a promise.   (Tr. 39).

Agent Parker read Tyler his *Miranda* rights and Tyler signed the Advice and Waiver of Rights Form at 1:56 p.m.   (Gov't Ex. C); (Tr. 20).   Tyler did not check the box indicating that he did not want a lawyer, yet he did not ask for an attorney or invoke his right to remain silent at any point during the interview.   (Tr. 20-21).   Agent Parker explained that the F.B.I. does not require the check box portion of the waiver and that he did not consider the form incomplete.   (Tr. 46).   Agent Parker added that he used the *Miranda* card as required by law and went above and beyond the *Miranda* requirements by asking for a written waiver.   (Tr. 46-47).

During the 20 minute interview, Tyler had the average demeanor of a suspect caught after a crime and was not emotional.   (Tr. 21, 23).   Agent Parker testified that Tyler did not disavow knowledge that Vasquez was going to rob the bank, but Tyler did state that he drove the car away from the bank.   (Tr. 48-49).   Without hesitation and in the presence of Agents Parker and Fredcove, Tyler signed an F.B.I. Consent to Search Form.   (Gov't Ex. D); (Tr. 22-23).   At the conclusion of the interview, Officers Gillsrude and Leonard drove Vasquez and Tyler to the Hennepin County Jail.   (Tr. 23, 150-51, 153-54).   Neither defendant made any statements during transport.   (Tr. 155).

After the squad car carrying Tyler and Vasquez departed, Agents Parker and Fredcove and Officer Merle of the Saint Paul Police Department searched the motel room.   (Tr. 23, 45).   The search yielded a black jacket, a can of pepper spray, a wrist hospital band bearing Tyler's name, bloody bed sheets, a handwritten note, and a newspaper open to a page with an article about the bank robbery.   (Tr. 23-24, 52-53).   Deputy Murphy testified that in addition to the items found in the motel room, Deputy U.S. Marshal Iverson found clothing and boots in a

dumpster behind the restaurant near the motel, which the F.B.I. photographed and took into evidence. (Tr. 24, 141).

## III.  DISCUSSION

### A.  Motions to Suppress Statements

Generally, a law enforcement officer must advise a person of his *Miranda* rights before interrogating a suspect in a custodial setting. *Miranda v. Arizona,* 384 U.S. 436, 444 (1966); *Illinois v. Perkins*, 496 U.S. 292, 297 (1992).  *Miranda* defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *United States v. Hogan*, 539 F.3d 916, 921 (8th Cir. 2008) (citing *Miranda,* 384 U.S. at 444).  An interrogation includes either express questioning or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response.  *Id.*; *United States v. Howard*, 532 F.3d 755, 762 (8th Cir. 2008); *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007).

Whether consent to search was voluntary or was the result of duress or coercion is a question of fact to be determined from the totality of the circumstances.  *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009); *United States v. Watters*, 572 F.3d 479, 483 (8th Cir. 2009).  This same analysis also applies to analyzing the voluntariness of a defendant's consent to search.  *See United States v. Comstock*, 531 F.3d 667, 676-77 (8th Cir. 2008).  The Eighth Circuit has identified a number of factors that a court should consider in determining if consent was voluntary in the totality of the circumstances:  (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of his *Miranda* rights; (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected

12

criminals; (5) the length of the detention; (6) whether the police used threats, physical intimidation, or punishment to extract consent; (7) whether the police made promises or misrepresentations; (8) whether the individual was in custody or under arrest when consent was given; (9) whether the consent was given in public or in a secluded location; and (10) whether the individual stood by silently or objected to the search. *Arciniega*, 569 F.3d at 398; *United States v. Bradley,* 234 F.3d 363, 366 (8th Cir. 2000); *Chaidez,* 906 F.2d at 381. No single factor is dispositive or controlling. *Bradley,* 234 F.3d at 366 (citing *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir. 1993)).

> **1. Defendant Vasquez's Motion to Suppress Statements [Doc. No. 34] Should be Denied Because His Statements Were Voluntary in the Totality of the Circumstances.**

> **a. Vasquez Was Adequately Advised of His *Miranda* Rights.**

Vasquez argues that his statements were not voluntary because he did not sign the *Miranda* card Agent Parker read to him. A suspect's refusal to sign a written Miranda waiver, however, "does not preclude a subsequent oral waiver." *United States v. Binion*, 570 F.3d 1034, 1041 (8th Cir. 2009) (citing *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991)). Prior to interviewing Vasquez shortly after his surrender, Agent Parker advised Vasquez of his rights. (Gov't Ex. A); (Tr. 20). Vasquez's response that he was willing to speak with Agent Parker and proceeding to discuss the bank robbery constitutes a waiver of his *Miranda* rights. (Tr. 15, 17). *See House*, 939 F.2d at 662 ("[D]efendant's refusal to sign a waiver form was not the equivalent of a statement indicating that he did not wish to answer questions."); *United States v. Cody*, 114 F.3d 772, 766 (8th Cir. 1997) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1973) (holding *Miranda* waiver need not be written or explicit)). In fact, before proceeding, Agent Parker had to interrupt Vasquez's voluntary, unsolicited comments regarding his role in the bank

robbery to give Vasquez his *Miranda* rights.   (Tr. 15).   At no time during the interview did

Vasquez assert his right to remain silent or request an attorney.   (Tr. 10).   Vasquez was

adequately *Mirandized*.  *Butler*, 441 U.S. at 373; *Binion*, 570 F.3d at 1041; *House*, 939 F.2d at

662-63.

### b.  Vasquez's Alleged Mental Illness Did Not Vitiate His *Miranda* Waiver.

Vasquez makes unspecified blanket references to his "not fully documented" mental

illness, to support his argument that his statements to Agent Parker were not voluntary.  (Def.

Vasquez's Mem. at 5) [Doc. No. 98].  Vasquez has not requested a mental health evaluation in

this case, nor has he provided any evidentiary support for his claims of previous incompetency.

Though a defendant's mental health background is a relevant factor in determining the

voluntariness of consent in the totality of the circumstances, Vasquez's conduct demonstrates

that he understood and waived his *Miranda* rights.   *See Arciniega*, 569 F.3d at 398; *Bradley,* 234

F.3d at 366; *Chaidez*, 906 F.2d at 381.   In the absence of any evidence supporting Vasquez's

claims of mental illness, this Court will not presume alleged Vasquez's mental impairments are

severe enough to prevent him from understanding his *Miranda* rights.   *See United States v.*

*Vinton*, 631 F.3d 476, 482-83 (8th Cir. 2011); *United States v. Makes Room For Them*, 49 F.3d

410 (8th Cir. 1995) (rejecting argument that defendant of below average intelligence was

incapable of waiving his *Miranda* rights and making voluntary confession).   Any alleged mental

defect Vasquez asserts does not invalidate the voluntariness of his consensual *Miranda* waiver.

### c.  Vasquez Was Not Under Duress When He Voluntarily Spoke with Agent Parker.

Vasquez relies heavily on cold weather, handcuffs, and the presence of firearms at his

arrest to argue that his consent to speak with Agent Parker was not voluntary due to physical

duress.   Vasquez's assertion that after his surrender, he was "literally put on 'ice'" mischaracterizes the evidence.  (Def. Vasquez's Mem. at 4).  Deputy Murphy checked on Vasquez's well-being while he was handcuffed and seated outside the hotel room.[9]  (Tr. 135-36). Vasquez's injuries did not interfere with his ability to speak with Agent Parker, nor did he ask for or appear to require medical care for his car crash injuries.  (Tr. 62-63, 28).   Though Vasquez seemed disappointed, he did not appear nervous when speaking with Agent Parker despite the presence of firearms at the scene.  (Tr. 28).  Vasquez's statements to law enforcement were voluntary and were not the product of intimidation or coercion when considered the totality of the circumstances.  *See Arciniega*, 569 F.3d at 398; *Chaidez*, 906 F.2d at 381.

> **2.  Defendant Tyler's Motion to Suppress Statements [Doc. No. 30] Should be Denied Because His Statements Were Voluntary in the Totality of the Circumstances.**
>
> > **a.   Tyler was *Mirandized* Prior to Making Statements to Law Enforcement.**

Tyler asks the Court to make a chain of speculative inferences to conclude that Tyler was not given his *Miranda* rights until after he spoke with Agent Parker.  Tyler relies on the statements of two officers with no percipient knowledge of the actual time at which Tyler and Vasquez were booked at the Hennepin County jail to argue that it was "physically impossible" for Tyler to have been *Mirandized* prior to speaking with Agent Parker.  (Def. Tyler's Mem. at 8-9) [Doc. No. 97].  This argument ignores Agent Parker's sworn testimony that he read Tyler his *Miranda* rights at the beginning of the interview.  (Tr. 20, 39).  Even assuming arguendo that Tyler did not sign the *Miranda* waiver until after he spoke with Agent Parker, such a sequence of events does not render Tyler's statements involuntary.  *See Oregon v. Elstad*, 470 U.S. 298, 309

---

[9] Vasquez contends that he was promised shelter inside a warm hotel room in exchange for talking with law enforcement.  (Def.'s Mem. at 6).  The Court finds no support for such an inference in the record.

(1985) (holding post-*Miranda* warning confession admissible provided defendant made statements knowingly and voluntarily); *United States v. Briones*, 390 F.3d 610, 612-13 (8th Cir. 2004).  In requesting to be housed with Vasquez, Tyler initiated the conversation.  (Tr. 19-20, 63-64).  He did not ask for an attorney or to exercise his right to remain silent at any point during the interview.  (Tr. 20-21).  Tyler's conduct and Agent Parker's testimony demonstrate that Tyler knowingly, voluntarily, and intelligently waived his Fifth Amendment rights.  *Miranda*, 384 U.S. at 475.

### b.  Tyler's *Miranda* Waiver Form Was Complete and Valid.

Tyler argues that because he left blank the section of the Advice and Waiver of Rights form regarding his right to speak with an attorney, his consent to speak with Agent Parker was not voluntary.  (Gov't Ex. C).  As stated earlier, a written waiver of rights is not required.  *See*, *e.g.*, *Butler*, 441 U.S. at 373; *House*, 939 F.2d at 662; *Cody*, 114 F.3d at 766.  Tyler indisputably and without objection signed the form in the presence of Agents Parker and Fredcove.  (Tr. 20-21, 46-47).  The "Advice of Rights" section of the form above Tyler's signature stated, "You have the right to talk to a lawyer before I ask you any questions . . . . If you cannot afford a lawyer, one will be provided for you before any questioning if you wish."  (Gov't Ex. C).  Tyler's written acknowledgment of his *Miranda* rights outlined in the "Advice of Rights" section including his right to counsel negates his omission or failure to complete the separate right to counsel section.  Agent Parker testified that he did not consider the form incomplete because the F.B.I. does not require a defendant to complete a separate section regarding requests for counsel.  (Tr. 46-47).  Agent Parker adequately advised Tyler of his right to counsel and used the U.S.D.A. Advice and Waiver of Rights form in satisfaction of *Miranda*.  (Gov't Ex. C); (Tr. 20-21, 46-47).  Tyler's statements are admissible.  *See Arciniega*, 569 F.3d at 398; *Chaidez*, 906 F.2d at 381.

### c. Tyler was Not Under Duress When He Consented To Speak With Agent Parker.

Tyler's arguments about the cold weather and the presence of weapons are even more unpersuasive than those of Vasquez. Tyler waited in a heated squad car before Agent Parker interviewed him. (Tr. 19, 37, 153). Officer Gillsrude adjusted Tyler's handcuffs after Tyler complained of discomfort. (Tr. 153). Tyler did not appear to be in any pain, was not emotional, and had the average demeanor of a suspect caught after a crime. (Tr. 21, 23). Although weapons were present, Tyler spoke with Agent Parker without hesitation. (Tr. 22-23). Tyler was not under duress when he spoke voluntarily with Agent Parker. *See Arciniega*, 569 F.3d at 398; *Chaidez,* 906 F.2d at 381.

### d. Law Enforcement Did not Intimidate or Deceive Tyler.

"A statement is involuntary when it is extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Hyles*, 479 F.3d 958, 966 (8th Cir. 2007). Law enforcement, however, "may be able to make and breach certain promises without rendering a resulting confession involuntary." *Tippitt v. Lockhart*, 859 F.2d 595, 597 (8th Cir. 1988) (internal citations omitted). The absence or presence of implied or express promises is only one voluntariness factor in the totality of the circumstances. *Bradley,* 234 F.3d at 366.

In his brief and at the motions hearing, Tyler's counsel attempted to interpret Agent Parker's statements regarding Tyler's request to be housed with Vasquez as a promise given in exchange for interview testimony. (Tr. 39); (Def. Tyler's Mem. at 12). To characterize Agent Parker's hearing statements as "admitted testimony" of a promise is inaccurate. (Def. Tyler's Mem. at 7). Not only did the Government object to that mischaracterization at the motions hearing, but Agent Parker stated that he did not believe that his statement that the U.S. Marshals

17

could take care of housing arrangements was a promise. (Tr. 38-39). Rather, Tyler was the party initiating the request that he and Vasquez be housed together—Agent Parker did not offer it unilaterally. (Tr. 19, 37, 153). This fact, coupled with Tyler's experience with the criminal justice system, undercuts Tyler's argument that Agent Parker's statement constituted deceit and intimidation undermining the voluntariness of his consent. *See Hyles*, 479 F.3d at 967 (emphasizing alleged promise originated with defendant); *United States v. Glauning*, 211 F.3d 1085, 1088 (8th Cir. 2000) (determining defendant's statements were voluntary in light of her demeanor and long history with the criminal justice system).

Additionally, Tyler argues that Fugitive Task Force members made a "psychological profile" of Tyler that allegedly led to manipulation, intimidation, and deceit. (Def. Tyler's Mem. at 7). Though many law enforcement officers were on the scene at Tyler's arrest, the evidence does not support the conclusion that Deputy Keyes' investigation of Tyler's background after he absconded from a halfway house compromised the voluntary nature of Tyler's consent. Tyler does not point to any specific deceitful statements or attempts at intimidation. (Def. Tyler's Mem. at 7). As such, Tyler's psychological profiling argument fails. Both of Defendants' Motions to Suppress Statements should be denied.

**B. Defendant Vasquez's Motion to Suppress Search and Seizure [Doc. No. 35] Should be Denied and Defendant Tyler's Motion to Search and Seizure Should be Denied [Doc. No. 29].**

A hotel guest is entitled to constitutional protection against unreasonable searches and seizures as is present in one's home. *Stoner v. California,* 376 U.S. 483, 490 (1964); *United States v. Roby*, 122 F3d 1120, 1125 (8th Cir. 1997). Seizures of individuals in hotels rooms are scrutinized almost as strictly as warrantless searches and seizures in an individual's home. *See Stoner*, 376 U.S. at 490; s*ee also United States v. Conner*, 127 F.3d 663, 666 (8th Cir. 1997).

The same voluntariness in the totality of the circumstances standard that applies to consensual statements to law enforcement apply to consent given to search an area in which an individual has a reasonable expectation of privacy. *See Comstock*, 531 F.3d at 676-77 (applying *Chaidez* voluntariness factors in evaluating validity of Consent to Search form); *see also Arciniega*, 569 F.3d at 398; *Bradley,* 234 F.3d at 366; *Chaidez,* 906 F.2d at 381.

### 1.   Defendants Voluntarily Gave Consent to Search the Hotel Room.

Given the substantial similarity and overlap in Defendants' arguments in support of their Motions to Suppress Search and Seizure, the Court will address Defendants' motions together. Both Defendants signed F.B.I. Consent to Search forms during interviews with Agent Parker; Vasquez signed after Agent Parker read him his *Miranda* rights; Tyler signed after he signed a *Miranda* waiver form.  (Gov't Exs. B, D); (Tr. 17-19, 22-23, 32, 57-58).  Based on the preceding analysis of Defendants' arguments challenging the admissibility of their statements on grounds of physical coercion, mental illness, timing, presence of weapons, and alleged promises, the Court determined that in the totality of the circumstances, Defendants knowingly and voluntarily consented to speak with Agent Parker.  *Arciniega*, 569 F.3d at 398; *Bradley,* 234 F.3d at 366; *Chaidez,* 906 F.2d at 381.  The Court need not repeat its earlier analysis but will analyze Defendants' remaining arguments regarding the search and seizure of items from their hotel room.

### 2.   The Protective Search for Weapons Did Not Violate the Fourth Amendment.

As guests of the Highway Motel, Tyler and Vasquez had a reasonable expectation of privacy in their motel room. *See Stoner*, 376 U.S. at 490; *Conner*, 127 F.3d at 666; *Roby*, 122 F.3d at 1125.  Both Defendants assert in their briefs that officers conducted a full search of their hotel room —as opposed to a protective search—before they signed Consent to Search forms.

(Def. Vasquez's Mem. at 6); (Def. Tyler's Mem. at 9).   But no record evidence supports this allegation.   The full search occurred after the squad car carrying Tyler and Vasquez left.   (Tr. 23, 45).   Deputy Iverson also found clothing in a dumpster behind the motel after Tyler and Vasquez left the scene.   (Tr. 24, 141).

Vasquez and Tyler also contend that Deputy Murphy's initial cursory search of the hotel room for weapons violated the Fourth Amendment because it was done before Defendants' signed Consent to Search forms.   "[T]he Fourth Amendment permits an officer to conduct a protective sweep of the premises if there are 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'"   *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1006 (8th Cir. 2010) quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990).   Limited protective searches conducted incident to arrest do not violate a defendant's reasonable expectation of privacy.   *See Buie*, 494 U.S. at 334-35.   At the time of Vasquez's surrender, officers had ample reasonable and articulable suspicion that Vasquez was involved in the TCF bank robbery based on his association with "escapee" Tyler and various surveillance videos and photos.[10]   (Def. Vasquez's Mem. at 1); (Tr. 6-9, 73, 76, 79, 94, 102, 115-16).   After Vasquez surrendered, Deputy Murphy entered the hotel room and visually searched the room for weapons.   (Tr. 121-23).   Deputy Murphy's initial search was truly cursory and well within the bounds of a protective search.   (Tr. 121-23); *see Buie*, 494 U.S. at 334-35; *Cisneros-Gutierrez*, 598 F.3d at 1006.   Officers did not fully search the motel room until after Vasquez and Tyler signed written Consent to Search forms and left the scene.   (Tr. 23, 45).   No Fourth

---

[10] Neither Defendant appears to contest the lawfulness of his arrest.   *See generally* (Def. Vasquez's Mem.); (Def. Tyler's Mem.).

Amendment violation occurred and Defendants' Motions to Suppress Search and Seizure should be denied.

### C.  Time Excludable under the Speedy Trial Act, 18 U.S.C. § 3162.

On July 20, 2011, Defendant Vasquez filed a *pro se* submission entitled "Motion for Relief from the Judgment – Protection of Due Process Rights" [Doc. No 72] alleging violation of the Speedy Trial Act, 18 U.S.C. § 3162 ("STA").  Vasquez's motion also asserts that Defendants did not consent to excluding time despite Defendants' unequivocal waiver of the STA days to allow for the appointment of new counsel.  *Id*.; *see* [Doc. No. 54-1].

At a hearing on Defendants' *pro se* motions for new counsel on June 20, 2011, Defendants explicitly waived the STA days attributable to the delay they caused in the case on the record.  The Court unequivocally stated this exclusion by explaining to Defendants that if they were granted new counsel, "all of this time, contrary to what Mr. Vasquez says, is excludable from any Speedy Trial Act calculation, because it's an issue that [Defendants] created.  Not that the Government has created but that [Defendants] created. Do you understand that?"  (PSM Tr. 35)[11] Vasquez responded, "Again, I agree with you 100 percent," yet asserted that Defendants did not create a delay by filing *pro se* motions for new counsel.  (PSM Tr. 35) The Court later asked whether Defendants wanted the motions hearing to go forward on Thursday, June 23, 2011, as scheduled, or whether they wanted the hearing to be postponed and the exclusion of the time it took to find new lawyers to be excluded under the STA.  (PSM Tr. 46).  Vasquez responded by stating, "I'm requesting new counsel with the exclusion of the Speedy Trial Act, your honor." (PSM Tr. 46).  In response to the Court's question, Tyler

---

[11] The page references cited herein are found in the Transcript of the *pro se* Motions Hearing, *United States v. Orlando Ray Vasquez (01), Gregory Scott Tyler (02)*, (11CR110), June 20, 2011 ("PSM Tr.").

responded, "[Y]es."   (PSM Tr. 49).   At the conclusion of the hearing, the Court specifically excluded the STA days between the date upon which Defendants filed their *pro se* motions for new counsel (June 8, 2011) and the date upon which new counsel was appointed (June 27, 2011). (PSM Tr. 57); *see* [Doc. Nos. 47-50, 57-58].

At the pretrial motions hearing on July 21, 2011, Defendants' counsel requested an extended briefing schedule.  (Tr. 164).  In response, the Court stated, "You do understand, don't you that any time that you take in connection with this is not counted towards the Speedy Trial Act time . . . and I'd request such a stipulation[.]" (Tr. 164).   Defendant Tyler's Counsel responded, "Yes.   And I reviewed that with [Tyler] and he understands that this would be excludable, as is the time frame from the first filing of the motions."  (Tr. 164).   Similarly, Defendant Vasquez's Counsel asserted, "And the same goes with my client. . . . [Vasquez] understands the excludability of time." (Tr. 164-65).   Despite several explicit representations to the Court that Speedy Trial Act waivers were forthcoming, to date, Defendants have not submitted STA waivers.  *See* [Doc. Nos. 80, 95].

In several instances on the record, Defendants made clear statements excluding the time under the STA from the filing of the first pretrial motions on April 15, 2011 through the date of this Report and Recommendation.   This Court is permitted to exclude time attributed to defendant-caused delays including the time "from the filing of [a pretrial] motion through the conclusion of the hearing on, or other prompt disposition of, such motion."   18 U.S.C. § 3161(h)(1)(D). Defendants' filing of  21 *pro se* submissions [Doc. Nos. 47-50; 71-75; 81-92] in addition to the 18 pretrial motions filed by their counsel actively prevented the swift deposition of their case.  At Defendants' request, new counsel were appointed, which caused a 43-day delay between the filing of their *pro se* motions (June 8, 2011) and the rescheduled criminal motions

hearing (July 21, 2011).  *See* [Doc. Nos. 47-53].  Based on the Court's authority to impose an excludable STA stop under 18 U.S.C. § 3161(h)(1)(D), the Court recommends that the 85 days between June 8, 2011 and September 1, 2011 be excluded under the STA.  *See*, *e.g.*, *United States v. Thao*, 2010 WL 3190722, at *5 (Aug. 12, 2010) ("[T]he time the Court spends considering a ruling on pretrial motions does not count toward the 70-day [STA] total") (citing 18 U.S.C. § 3161(h)(1)(D)); *United States v. Okeayainneh*, 2011 WL 2470052, at *1 (D. Minn. Jun. 20, 2011) (explaining exclusion of time under which pretrial motions are under advisement) (*quoting Bloate v. United States*, 130 S. Ct. 1345, 1349 n.1 (2010)); *United States v. Longs*, 2008 WL 906797,  at * 1 (D. Minn. Apr. 2, 2008) (excluding days from STA as a result of pending pretrial motions).

### D.  Defendant's Motions to Suppress Eyewitness Identifications

Defendants Vasquez and Tyler move to suppress eyewitness identifications [Doc. Nos. 36, 28].  The Government states it is not aware of any photographic spreads, lineups, or show-ups to be used with eyewitnesses.  The Government will not be conducting an in-court line up or photo spread in this case.  [Doc. Nos. 43, at 13; 44, at 7].  As such, the Court recommends that Defendants' motions be denied as moot.

### IV. RECOMMENDATION

Based on the foregoing, all the files and records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Vasquez's Motion to Suppress Statements Made by Defendant [Doc. No. 34] be **DENIED**;

2. Defendant Tyler's Pretrial Motion to Suppress Statements, Admissions, and Answers [Doc. No. 30] be **DENIED**;

3.  Defendant Vasquez's Motion to Suppress Search and Seizure [Doc. No. 35] be **DENIED**;

4.  Defendant Tyler's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 29] be **DENIED**;

5.  Defendant Vasquez's *Pro Se* Motion for Relief from the Judgment Protection of Due Process Rights [Doc. No. 72] be **DENIED**;

6.  The Speedy Trial Act days elapsed between April 15, 2011 and September 1, 2011 be **EXCLUDED**;

7.  Defendant Vasquez's Motion to Suppress Eyewitness Identification [Doc. No. 36] be **DENIED as moot**; and

8.  Defendant Tyler's Motion to Suppress Eyewitness Identifications [Doc. No. 28] be **DENIED as moot**.

Dated: September 14, 2011

s/ Steven E. Rau_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **September 28, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.